**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

**KYLE TOPPS, et al.,**

      **Plaintiffs,**

      **vs.**

**ECP OPTOMETRY**
**SERVICES LLC, et al.,**

      **Defendants.**

**Case No. 4:25-cv-01301-AGF**

**JOINT MOTION FOR APPROVAL OF SETTLEMENT UNDER THE**
**FAIR LABOR STANDARDS ACT**

Named Plaintiff Kyle Topps and Defendants ECP Optometry Services, LLC and Eyecare Partners, LLC ("the Parties"), by and through their respective counsel, and for their Joint Motion for Approval of FLSA Settlement, state as follows:

1.      This action arises under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq., and alleges that Defendants ECP Optometry Services, LLC and Eyecare Partners, LLC failed to properly compensate certain hourly employees for all hours worked. [Dkt. # 1, Arizona Litigation]. The claims asserted here are procedurally related to those brought in *Jodeci Vanorden and Gabriella Gantt v. ECP Optometry Services, LLC and Eyecare Partners, LLC*, Case No. 2:24-cv-01060 (D. Ariz.) ("Arizona Litigation"), which was filed earlier and involved overlapping factual allegations concerning Defendants' compensation practices.

2.      The operative complaint alleges Defendants employed Plaintiff and other similarly situated individuals in hourly, non-exempt positions during the relevant period and required them to work in excess of forty hours per workweek without paying overtime compensation at one and one-half times their regular rate of pay, in violation of the FLSA. Specifically, Plaintiff alleges

Defendants suffered or permitted off-the-clock work and failed to compensate that time as required by law.

3. Defendants deny Plaintiff's allegations, deny they violated the FLSA, and contend they complied with all applicable wage-and-hour requirements. The Parties dispute, among other issues, whether uncompensated off-the-clock work occurred, the number of overtime hours allegedly worked, and whether Plaintiff or any settlement collective member would be entitled to overtime compensation or liquidated damages under the statute.

4. On or about December 23, 2024, the court in the Arizona Litigation conditionally certified a collective, defined as:

> All employees who work[ed] for Defendants ECP Optometry Services, LLC and/or Eyecare Partners, LLC; within the past three years; who work[ed] over 40 hours in any given workweek as a past or present employee; who worked on an hourly basis; who did not receive overtime compensation for their off the clock work are known as (the "Collective Members").

[Dkt. #47, Arizona Litigation]

5. Notice was sent to approximately 4,250 current and former employees, as defined by the Court's December 23, 2024 Order. Following notice to employees in the Arizona Litigation, approximately 120 Arizona current and former employees filed opt-in consent forms and approximately 500 non-Arizona current and former employees filed opt-in consent forms. This represents approximately 15% of the entire putative collective who were sent notice. The consent form filed by each individual opt-in plaintiff contains the following language:

> I designate Weiler Law PLLC to represent me in this action and to negotiate a settlement of any and all overtime compensation claim(s) I have against Defendants in this lawsuit.

[Example at Dkt. #174-1, Arizona Litigation].

6. On or about August 27, 2025, the court in the Arizona Litigation split the action and transferred those opt-in plaintiffs who did not live or work in Arizona to this Court. [Dkt. #188, Arizona Litigation]. When transferred, this Action had approximately 500 opt-in plaintiffs.

7. Following the transfer, the Parties engaged in formal discovery directed to the claims asserted in this action. The discovery process included written discovery served on a representative sampling of participating Opt-In Plaintiffs and on Defendants. During that process, approximately 250 Opt-In Plaintiffs in this Action were served with written discovery consisting of three requests for production, five interrogatories, and ten requests for admissions.  [Dkt. # 194, Missouri Litigation].

8. On or about October 17, 2025, Defendants served discovery to the first tranche of sixty-two Opt-In Plaintiffs, with responses due on November 16, 2025. As of the date of settlement, sixteen of the first tranche of Opt-In Plaintiffs responded to written discovery. On or about October 31, 2025, Defendants served discovery to the second tranche of sixty-three Opt-In Plaintiffs, with responses due on December 1, 2025.  As of the date of settlement, eleven of the second tranche of Opt-In Plaintiffs responded to written discovery. On or about November 14, 2025, Defendants served discovery to the third tranche of sixty-three Opt-In Plaintiffs, with responses due on December 15, 2025.  As of the date of settlement, sixteen of the third tranche of Opt-In Plaintiffs responded to written discovery. On or about December 1, 2025, Defendants served discovery to the fourth tranche of sixty-three Opt-In Plaintiffs, with responses due on January 14, 2026.  As of the date of settlement, eighteen of the fourth tranche of Opt-In Plaintiffs responded to written discovery. As of the date of settlement, sixty-one out of the two hundred fifty-one Opt-In Plaintiffs who were served with discovery responded.

9.      On or about December 19, 2025, sixty-eight Opt-In Plaintiffs withdrew their consent forms in this Action. [Dkt. # 204, Missouri Litigation].  Through discovery, including the consideration of the responsiveness to opt-in discovery, the Parties developed a concrete record sufficient to assess the merits, defenses, and potential exposure associated with the claims asserted.

10.     The Parties' discovery efforts were accompanied by targeted investigation and analysis designed to evaluate the factual and legal issues presented by the case. The exchange of written discovery and review of payroll and employment data allowed the parties to assess disputed issues including whether uncompensated off-the-clock work occurred, the extent of any alleged overtime, and Defendants' knowledge, or lack thereof, and compensation practices.

11.     Based on this developed record, as well as counsels' respective experience litigating wage and hour matters under the FLSA, the Parties were able to reasonably evaluate the strengths and weaknesses of their respective positions. This investigation and discovery provided an adequate factual foundation for informed, arm's length settlement negotiations. In evaluating settlement, the Parties considered the discovery record developed in this case, the disputed factual and legal issues, and the risks, costs, and delay associated with continued litigation.

12.     Counsel for both sides are experienced in wage-and-hour litigation and were able to assess the merits of Plaintiffs' claims and Defendants' defenses based on the evidence obtained through discovery, including written responses, and payroll data. The negotiations reflected compromise on contested issues such as proof, or lack thereof, of off-the-clock work, the number of alleged overtime hours, entitlement to liquidated damages, and the likelihood of success if the matter proceeded through further motion practice or trial.

13.     As a result of these negotiations, the Parties successfully reached a confidential settlement agreement (the "Settlement Agreement"), which resolve all of the opt-in plaintiffs'

claims in both this Action and the related Arizona Litigation. A redacted copy of the Settlement Agreement is attached hereto as **Exhibit A**.[1]

14.     The resulting Settlement Agreement reflects a negotiated balance of these risks and considerations and is part of a coordinated resolution of related Arizona Litigation. The Agreement is expressly conditioned on approval of the settlement reached in the Missouri action and is intended to provide a fair and efficient resolution of the claims asserted here while avoiding further litigation expense and uncertainty. The settlement was reached without admission of liability and represents a compromise of bona fide disputes under the FLSA.

15.     Under the terms of the Settlement Agreement, Defendants agreed to fund a monetary settlement as part of a coordinated, global resolution of related Fair Labor Standards Act claims pending in this Action and in the related Arizona Litigation. This amount represents the maximum total consideration Defendants will pay to resolve the claims asserted in this Action and includes all settlement payments to Opt-In Plaintiffs, any Service Awards approved by the Court, attorneys' fees and litigation costs, and settlement administration expenses.

16.     Defendants deny all liability and dispute Plaintiffs' allegations, including the existence and extent of any unpaid overtime or off-the-clock work. Defendants nevertheless agreed to fund the Settlement to avoid the burden, expense, and uncertainty of continued litigation. The Settlement Fund provides meaningful monetary relief to those individuals who elect to participate in the settlement while preserving the rights of individuals who choose not to participate, consistent with the opt-in structure of the FLSA.

---

[1] The Parties have redacted only the amount of the settlement payment, which, if disclosed on the record, would defeat important purposes of the Settlement Agreement, which was to resolve the Parties' disputes and claims in a confidential manner, without requiring the Parties to disclose in a public record the specific terms of their confidential settlement, and to promote peace and finality for each side. The Parties have also filed an unredacted version of the Settlement Agreement as an exhibit to the Memorandum in Support of their Joint Motion to File the Unredacted Settlement Agreement Under Seal.

17.     The Settlement Agreement defines the Opt-In Plaintiffs to include the 443 individuals who worked for Defendants in hourly, nonexempt positions during the applicable settlement period, who filed a consent form to join the Lawsuit as opt-in plaintiffs, and who remained opt-in plaintiffs as of the signing of the Settlement Agreement. Participation in the settlement is consistent with the opt-in structure of the Fair Labor Standards Act. As specifically authorized in each Opt-In Plaintiff's consent form, Collective Counsel has the authority and power of attorney to enter into a settlement on their behalf. Opt-In Plaintiffs will each receive a Settlement Award and release the claims specified in the Settlement Agreement.

18.     Opt-In Plaintiffs will receive a Settlement Award calculated pursuant to the allocation methodology set forth in the Settlement Agreement. Settlement Awards are calculated based on each participating individual's relative number of workweeks worked during the covered period, as reflected in Defendants' payroll and employment records. This workweek-based methodology provides an objective and uniform basis for allocating settlement payments among Opt-In Plaintiffs. For the Sixty-One Opt-In Plaintiffs who participated in discovery ("Discovery Plaintiffs"), they are to receive a double pro rata share under the Agreement.  This structure provides additional compensation to those Opt-In Plaintiffs who affirmatively participated in the litigation and helped to bring it to resolution.

19.     The Settlement Agreement provides for a limited and carefully tailored release of claims that is consistent with the opt-in nature of the Fair Labor Standards Act. Opt-In Plaintiffs release Defendants and the other Released Parties only from wage-and-hour claims arising under the FLSA and any applicable state or local wage-and-hour laws, to the extent such claims arise from or relate to the factual allegations asserted in this Action during the applicable settlement period. The Settlement Administrator will distribute notices to the Opt-In Plaintiffs accompanying

the Settlement Awards confirming the scope of the release, outlining how their Award was calculated, and summarizing key provisions from the Settlement Agreement.

20.    Only the Named Plaintiff who receives a Service Award will execute a broader general release of claims under the Settlement Agreement. That broader release is expressly supported by separate and independent consideration, *e.g.*, the Service Award, which is specifically identified and bargained for in the Settlement Agreement. No other Opt-In Plaintiff is required to release any claims beyond the limited wage-and-hour claims arising under the FLSA and applicable state or local wage-and-hour laws.

21.    The Service Award to Topps is reasonable. Topps has served as the sole named plaintiff in this Action, remained in regular communication with Collective Counsel throughout the litigation and the settlement negotiations, and assisted with written discovery. He also undertook the reputational and professional risk that accompanies publicly attaching one's name to litigation against a former employer on behalf of hundreds of others. In addition, the $15,000.00 Service Award is separate, bargained-for consideration for the general release that Topps alone provides; no other Opt-In Plaintiff gives such a release or receives such an award. Although the Service Award exceeds the average Settlement Award, service awards of this magnitude are routinely approved in this Circuit. *See Caligiuri v. Symantec Corp.*, 855 F.3d 860, 867–68 (8th Cir. 2017) ("courts in this circuit regularly grant service awards of $10,000 or greater").

22.    The Eighth Circuit noted a circuit split on the issue of whether all FLSA settlements require judicial approval. *See, e.g.*, *Barbee v. Big River Steel, LLC*, 927 F.3d 1024, 1026 (8th Cir. 2019) ("There is a circuit split on whether . . . to require judicial approval of all FLSA settlements. . . We have never taken a side on this issue. . . . [W]e need not decide our view on the circuit split today."). In general, however, district courts approach the issue by exercising some level of review

of any proposed FLSA settlement. *See, e.g.*, *Melgar v. OK Foods*, 902 F.3d 775, 779 (8th Cir. 2018) ("[W]e will assume without deciding that the district court has a duty to exercise some level of review of the [proposed FLSA Settlement] Agreement and the attorneys' fee award.").

23.     This Court has recognized this uncertainty. *See Collins v. Veolia ES Industrial Services, Inc.*, Case No. 4:15-CV-00743-AGF, 2016 WL 1275598, at *2 (E.D. Mo., Apr. 1, 2016) (Fleissig, A.) ("The law is unsettled as to whether the judicial approval of a proposed settlement of FLSA claims is required in the absence of a certified class.") (internal alteration and citation omitted)); *see also Tanner v. Empire Fin., Co. LLC*, No. 4:19-CV-0825-SEP, 2020 WL 7316115, at *1 (E.D. Mo. Dec. 11, 2020); *Del Toro v. Centene Mgmt. Co., LLC*, 4:19-CV-02635-JAR, 2021 WL 1784368, at *1 (E.D. Mo. May 5, 2021).

24.     As a matter of pragmatism, and to avoid the Parties being "le[ft] . . . in an uncertain position," *see Collins*, 2016 WL 1275598, at *2, the Parties respectfully request the Court approve their settlement.

25.     When evaluating whether to approve a proposed FLSA settlement, a district court evaluates whether the litigation involves a bona fide dispute and that the proposed settlement is fair and equitable to all parties. *Collins*, 2016 WL 1275598, at *2; *Hill v. World Wide Technology Holding Co., Inc.*, Case No. 4:11CV02108 AGF, 2012 WL 5285927, at *1–2 (E.D. Mo., Oct. 25, 2012) (Fleissig, A.); *Berry v. Best Transportation, Inc.*, No. 4:16-CV-00473-JAR, 2020 WL 512393, at *1 (E.D. Mo. Jan. 31, 2020) (Ross, J.).   In determining the fairness of an FLSA settlement, courts "should be mindful of the strong presumption in favor of finding a settlement fair." *Roach v. AutoAssure, LLC*, Case No. 4:23-cv-00484-SEP, 2023 WL 8185069, at *2 (E.D. Mo., Nov. 27, 2023) (internal quotations and citation omitted).

26.     The Court "may only approve a settlement agreement in a case brought under § 216(b) of the FLSA after it determines that the litigation involves a bona fide dispute and that the proposed settlement is fair and equitable to all parties." *Collins*, 2016 WL 1275598, at *2. "A settlement is bona fide if it reflects a reasonable compromise over issues actually in dispute, since employees may not waive their entitlement to minimum wage and overtime pay under FLSA." *King v. Raineri Const., LLC*, No. 4:14-CV-1828 CEJ, 2015 WL 631253, at *2 (E.D. Mo. Feb. 12, 2015); *Roach*, 2023 WL 8185069, at *2.

27.     This settlement resolves a bona fide dispute under the FLSA. Plaintiffs allege that Defendants failed to pay overtime compensation for all hours worked, including allegedly uncompensated off-the-clock work, in violation of the Act. Defendants deny Plaintiff's allegations, deny that any uncompensated overtime work occurred, and contend that they complied with all applicable wage-and-hour requirements. The Parties further dispute the number of overtime hours purportedly worked, whether Defendants had actual or constructive knowledge of any alleged off-the-clock work, and whether Plaintiff or any Opt-In Plaintiff would be entitled to overtime compensation or liquidated damages under the statute. These disputed factual and legal issues form the basis of the bona fide dispute resolved by the Settlement Agreement.

28.     The existence of a bona fide dispute is further demonstrated by the posture of this litigation at the time settlement was reached. Following transfer of Plaintiff Kyle Topps's claims from the related Arizona action, the Parties engaged in formal discovery in this Court. Defendants produced payroll and employment data relevant to the claims at issue, including compensation policies and wage-and-hour compliance. Plaintiffs provided discovery responses concerning their job duties and alleged work hours. The lack of participation by opt-in plaintiffs in discovery also helped clarify the scope of the litigation and provide perspective for the Parties during negotiations.

This discovery clarified both the scope of the claims and the Parties' competing positions on liability, damages, and defenses, and provided a concrete factual record upon which to evaluate the risks of continued litigation.

29.     When examining whether the settlement is reasonable, courts consider the following factors: "the stage of the litigation, the amount of discovery exchanged, the experience of counsel, and the reasonableness of the settlement amount based on the probability of plaintiffs' success with respect to any potential recovery." *Collins*, 2016 WL 1275598, at *2; *see also Del Toro*, 2021 WL 1784368, at *1. Where, as here, the FLSA settlement was the product of arm's length negotiation "courts should be mindful of the strong presumption in favor of finding a settlement fair." *King*, 2015 WL 631253, at *2-3.

30.     Here, the terms of the Settlement Agreement satisfy these factors. First, the parties litigated this case for over two years. They exchanged substantial information and voluminous records, which resulted in the resolution of this Action. If the litigation had continued, it would have been complex, expensive, and protracted. The Parties likely would have appealed any final judgment entered by this Court. Instead of expensive, complicated, and protracted litigation, this Settlement provides significant monetary relief to Opt-In Plaintiffs now.

31.     Second, this collective action was resolved only after Defendants produced comprehensive payroll data for all Opt-In Plaintiffs. In addition, at the time the Action was resolved, approximately 450 individuals remained in this Action and approximately 70 individuals participated in discovery. The stage of litigation had advanced so that Plaintiffs' Counsel could fairly and fully evaluate the value of the settlement. As a result, the Parties had sufficient information to evaluate the strength of their claims. This factor supports granting approval of the

Settlement Agreement. Plaintiffs' Counsel's experience as wage and hour litigators further supports approval of the Settlement.

32.     In connection with settlement negotiations, Plaintiffs' Counsel analyzed the payroll and employment data produced by Defendants and constructed a damages model based on the approximately 20,052 workweeks attributable to the Opt-In Plaintiffs in this Action during the relevant period, as reflected in the payroll data Defendants produced and the damages assumptions the Parties exchanged during their settlement negotiations. Because this is an off-the-clock case, any estimate of exposure necessarily rests on assumptions concerning the amount of uncompensated time worked each workweek, an issue the Parties sharply dispute. Assuming an average of twenty minutes of uncompensated off-the-clock work per workweek at an overtime rate of $45.00 per hour (one and one-half times the $30.00 average regular rate assumption used by both Parties in their negotiations), Plaintiffs' single damages would total approximately $300,780. At thirty minutes per workweek, single damages would total approximately $451,170, or approximately $902,340 inclusive of an equal amount of liquidated damages.

33.     Plaintiffs' Counsel discounted these figures substantially to account for serious and specific litigation risks. First, because alleged off-the-clock work is by definition absent from time records, each Plaintiff would bear the burden of establishing the amount and extent of uncompensated work largely through testimony, and Defendants dispute both that such work occurred and that they had actual or constructive knowledge of it. Second, the FLSA requires overtime compensation only for hours worked in excess of forty in a workweek. Defendants' payroll data reflected that a meaningful portion of the Opt-In Plaintiffs' recorded hours fell below forty in many workweeks, and in those workweeks even proven off-the-clock time would not give rise to an overtime violation. This substantially reduces the number of workweeks that could

actually generate FLSA damages below the 20,052 workweeks used in Plaintiffs' model. Third, liquidated damages are not automatic; Defendants would assert a good-faith defense under 29 U.S.C. § 260, placing up to half of the higher-end exposure figures at risk. Fourth, the litigation posture presented real participation risk: sixty-eight Opt-In Plaintiffs had already withdrawn their consents, only sixty-one of the two hundred fifty-one Opt-In Plaintiffs served with written discovery responded, and continued litigation carried the prospect of further dismissals for non-participation and of decertification, either of which would have materially reduced any collective recovery. Fifth, continued litigation would have required substantial additional discovery, including depositions, dispositive motion practice, trial, and a likely appeal, delaying any recovery by years.

34.    Measured against this analysis, the settlement provides a substantial and certain recovery. The Gross Settlement Amount provides immediate relief on claims that carried a genuine risk of yielding little or no recovery for many Opt-In Plaintiffs. In light of the proof and participation risks described above, this recovery falls well within the range of reasonableness and supports approval of the Settlement.

35.    Contrastly, Defendants believe the total liability exposure is minimal, if any at all. However, Defendants considered the cost of defense and continuing with litigation through its conclusion, including seeking affirmative relief through motion practice, to be a major contributing factor to the settlement value.

36.    Third, the Settlement Agreement has the effect of (1) providing monetary relief to the Opt-In Plaintiffs, (2) in exchange for a limited release of claims, and (3) eliminating the inherent risks both sides would bear if this collective action litigation continued to resolution on the merits. Under these circumstances, a presumption of fairness should attach to the Settlement.

*See Lynn's Food Stores, Inc. v. U.S.*, 679 F.2d 1350, 1354 (11th Cir. 1982) (recognizing that courts rely on the adversarial nature of a litigated FLSA case resulting in settlement as indicia of fairness).

37. In summary, the Settlement Agreement is a result of contested litigation and was reached after extensive settlement negotiations. The Parties engaged in a thorough analysis of the facts and the data at issue and the Settlement provides Opt-In Plaintiffs with significant monetary relief in lieu of risky protracted litigation. Because the settlement is a fair and reasonable resolution of a *bona fide* dispute between the Parties, it should be approved.

36. The Settlement Agreement allocates approximately 22.8% of the Gross Settlemetn Amount to a combined award of attorneys' fees and litigation costs. The FLSA includes a fee-shifting provision. See 29 U.S.C. § 216(b) ("The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action.").

37. The requested percentage is below the range approved in this District and throughout the Eighth Circuit. Courts in this District have approved attorneys' fee awards of one-third of a common settlement fund in FLSA collective actions, plus reimbursement of litigation costs. *Johnson v. Himagine Sols., Inc.*, No. 4:20-CV-00574-SPM, 2021 U.S. Dist. LEXIS 118410 (E.D. Mo. June 25, 2021). Collective Counsel's request of approximately 22.8% of the Gross Settlement Amount, inclusive of litigation costs, is reasonable.

38. Collective Counsel undertook this matter on a contingent basis with no guarantee of any recovery. Collective Counsel litigated these related actions for over two years, including conditional certification, court-approved notice to approximately 4,250 individuals, four tranches of written discovery to Opt-In Plaintiffs, transfer proceedings, and multiple rounds of arm's-length settlement negotiations, and obtained a substantial recovery for the Settlement Collective

notwithstanding the significant proof and participation risks described above. Each Opt-In Plaintiff's consent form expressly designated Collective Counsel to negotiate a settlement of their claims, and Defendants do not oppose the requested award. The Attorney Fee and Costs Award is therefore fair and reasonable and should be approved.

THEREFORE, the Parties respectfully request that this Honorable Court enter a final order[2] approving the settlement and dismissing the action with prejudice.

Dated:  August 13, 2026                           Respectfully submitted,


| | |
|---|---|
| */s/ Jason Barrat (with authorization)* | */s/ James Payer* |
| James Weiler, AZ | Allison C. Williams |
| Jason Barrat, AZ | Texas Bar No. 24075108 |
| WEILER LAW PLLC | acwilliams@littler.com |
| 5050 N. 40th St., Suite 260 | LITTLER MENDELSON, P.C. |
| Phoenix, AZ 85018 | 1301 McKinney Street, Suite 1900 |
| Tel & Fax: 480.442.3410 | Houston, Texas 77010 |
| jweiler@weilerlaw.com | Telephone:     713.951.9400 |
| www.weilerlaw.com | Facsimile:     713.951.9212 |

**ATTORNEYS FOR PLAINTIFFS**                James Payer
                                            Bar No. MO76967
James Burr Shields                          jpayer@littler.com
Michael D. Zoldan                           7777 Bonhomme Ave., Suite 1220
SHIELDS PETITTI & ZOLDAN, P.C.              St. Louis, MO 63105
5090 N. 40th Street, Suite 207              Telephone:     314.659.2000
Phoenix, AZ 85018
E-Mail: burr@shieldspetitti.com            **ATTORNEYS FOR DEFENDANTS**
E-Mail: mdz@shieldspetitti.com             **ECP OPTOMETRY SERVICES, LLC**
E-Mail: docket@shieldspetitti.com          **AND EYECARE PARTNERS, LLC**

**CO-COUNSEL FOR PLAINTIFFS**

---

[2] A proposed order is attached as **Exhibit B**.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this 13th day of August 2026, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system and served upon the counsel of record.

*/s/ James Payer*

James Payer